Yes, I know, Mike. Well, I agree, Your Honor. Obviously, having listened to and heard some of the arguments in the previous case, we have a lot of evidence that the court has been able to get a lot of evidence in regard to what we claim was the improper conduct of the evidence we've received and testimony about the 2002 testing and the results of that. In terms of the sufficiency of the claim, which was argued in 1 of the briefs, not only do we have a separate section which is argued in 1 of the statements that we've discussed in the previous argument, but Mr. Starnes also defended that as a matter of law, there wasn't sufficient evidence with regard to the interactive violations themselves. The focus of Mr. Starnes' argument, both in this report and in the appeal, is that we contend that Mr. Starnes really, the theory here, is that he would cater better to Mr. Starnes than he would to Mr. Jordan. I'm not sure how the scenario played out in terms of who was actually the owner-operator when this happened. He could be in charge of the operation. Clearly, he wasn't able to do that. Well, let me give you a question in terms of how that is, because we have to look at this in the light most favorable for the government. I take it, then, in the position as a jury to have the irrational belief that Mr. Starnes was exercising supervision and control over those actively involved in the Clean Air Act violations, all statements said? Well, as a matter of law, I mean, I'm not going to denigrate the jury for doing the job, but I think the court, the district court, the number of issues reviewed in the past under the law, and I think under the facts of this case, it's clear that Mr. Starnes was certainly involved, to some extent, in the air monitoring process, which is what it looked like. Wasn't he involved enough that the people who were working there thought he was a co-manager investigating? That's the evidence, right? That he brought people on board and helped assemble the team and he was there as people were introduced to the project and the people who worked on the project thought he was one of the guys in charge. There was testimony to that. Correct. But Mr. Starnes really was brought in only to do the air monitoring of George's operation entirely. Although Mr. Starnes did bring in Mr. Guacamo, I forget his name was, Mr. Starnes, even if left to go to trial shortly after this project commenced and only to return on a yearly basis when it's clearly completed. So the day-to-day operations were really handled by Mr. George. And the focus of the Air Act violations centered on the asbestos abatement procedures that were going on in terms of the usage of asbestos. How to equip the ceilings and how to put the waste material down the floor and all the problems with the after polisher. It wasn't their testimony that Mr. Starnes was the one who said each and every time they would use the pow washer and not use it on site. In other words, that he was involved in saying, in fact, forget all that stuff that the public government used to get the pow washer out and start stripping the stuff off. There was evidence, certainly, of his knowledge of the pow washer. I think it was more than knowledge. I mean, he was involved in making an act, right? Well, I think, I mean, my reading of the record is that it was really Mr. George who was directing the operation in terms of how the asbestos removal was in place, including the structure of it. And so, and of course, all of the other... Well, help me out because maybe I'm wrong. I thought the record showed that Mr. Starnes was the one who got a training video and showed that Mr. Starnes was the one who demonstrated how to use the pow washer to Mr., I'm not sure what his name was, right? Carmichael. How was his name? I think it was Carmichael. Carmichael. You know who I'm talking about. Right. But he was, Mr. Starnes was the one, not Mr. George, who took those affirmative steps. Am I right about the record on that? I believe so. From my understanding, and again, I'll rely on the record, but I do think that Starnes, although he did do those things, I don't think he was the one that actually was responsible for carrying out that whole procedure and process. For example, the evidence was unequivocal that it was Mr. George who set up the process of trying to remove the tainted water from the apartment to put up the PVC piping, and that's how the composite material wound up coming outside of the buildings and filled up the ground if it wasn't sufficiently wet, and those were part of the violations. Right. Even if we were to agree with you that Mr. George was in it day to day in a more aggressive way, how does that relieve Mr. Starnes' direct liability if he's in it himself in the ways that the record describes? Well, I think to the extent that he was in it, it was at the very early beginning stages, not during the actual process, which resulted in the problem of the apartment. And so, to the extent, like I said, that he was involved, it was a very limited problem that he had to solve. And although he may have trained some people in the plot, I think under certain amount of law, in order to sustain the burden of the state that the government has here, I don't think it's going to rise to that level. And so, there was no sufficient evidence on those. And in fact, George was the one who actually purchased the pressure washers and also was the one that set up the state ship method, using the piping and all sorts of things. Those are the processes that would override the Clean Air Act violations that occurred. In terms of the falsity of the false statements count, I think my prior counsel really addressed that. And I think all my arguments are up to this court to agree to that. Certainly, I acknowledge that the evidence as to whether George was concerned with these particular counts, although I suppose to make that, as was brought up earlier, that there was a false statement. And so, I do think that that's an element, a serial element of the false statement charges. And that's how the statement... They were issued. Well, but the way I read the indictment and the way I read the manner in which the statement was presented was that the falsity of it was what the results were. Because, and I'm not an environmental law expert, but my understanding based on reading the record is that it's this percentage of asbestos in the material that fits into the regulation. And because the issue had to be whether it was under 1% or over 1%, that was really the material part of these documents. So, I'll certainly admit, the evidence in the record has to go back to the government that these air monitoring reports actually were not conducted. There was no proof at all that the results therein, which is really the material part of the report, contained a false statement. And therefore, we would request that the court find at least a significant amount of asbestos. What more can you add to that? Really, the one thing that I wanted to point out, again, you brought up, I think, in rebuttal that the district court, and reviewing the district court's initial ruling, it wasn't really an equivocal statement. It was, I mean, unequivocally very emphatic that this evidence was unduly prejudicial. And I don't think the addition of Mr. Farrell's testimony in any way added to ameliorating either the relevance or the unduly prejudiced. The one thing that I wanted to point out is that there was evidence in the record that subsequent to the cease and desist ruling of this year, the government hired additional workers to clean up the city's crime. And so, therefore, part of the prejudice in terms of the testimony, the unduly prejudiced testimony was the very graphic testimony of the really deplorable conditions in that building 31. You've got hay, ceilings falling in, and bathtubs full of all kinds of garbage. It's just depicting a very deplorable and unfortunate condition, which the defendant had nothing to do with. They never even went in to build the building. And so, I really don't see how the judicial court initially agrees, number one, in terms of relevance. But secondly, as to the government's point earlier that they proved that there was injustice in two other ways. Well, I think all of it. Because everything was presented in photo, and I don't think there's any way... Well, I think to the extent that the case was presented, like I said, all together. And so, it's hard. Certainly, I don't believe the government's arguing that it's a harmless issue. But I don't think it's possible to dissect the undue prejudice relating to the Clean Air Act, while statelessly trying to say that really all went part and parcel together. If the government's case is that both of these individuals did all of the harmful things, then I think the undue prejudice goes to the entire case. And so, I guess we can go back to the trial. But unfortunately, it's not inclined to do it. I think certainly, you know, I really do think it's a building of the Clean Air Act, but that's the one state. So, I do see that my time has elapsed. Well, I'll be back. Thank you very much. Ms. Ellis? Good morning again, Your Honors. Certainly, there's the United States Presented its theory, with respect to Mr. Sharns, as an operator of the demolition project, as well as proceeding under an aiming and abetting theory. And as we set out in our brief, that this report charged the jury on all theories, broken down in the verdict form, and the jury returned a verdict of guilty on all theories. But there is certainly evidence that Mr. Sharns acted as an operator at this project. He did, he was, again, he was licensed as a worker, a supervisor, and an instructor. He recruited Mr. Cartamo and other workers. He directed them to do the work illegally and fast. He promised bonuses to the workers, which he was conditioned to work. He falsified the air monitoring reports, and he communicated with the authorities. Certainly, viewing this evidence, all of this evidence, in the light and scalable to the government, it supports the jury's finding that he was, you know, he was guilty as a principal in this project. And definitely, there is this evidence that Sharns was the person who told Cartamo that a power washer would be used, and he showed him a video demonstrating this method with Mr. George. That was, we direct the court to our supplemental appendix to pages 132, 136, and 142 and 143. The receipt for the power washer was found in Mr. Sharns' office. All of it, I mean, it's very clear from the testimony from workers, Mr. Collins and Mr. Breaux, that they understood that both Mr. Sharns and Mr. George called the shots here. Mr. Sharns cannot be absolved because he was not present. He was there the first seven days. He saw the use of the power washer. He was there when it happened. He came back to the site at the end when there were problems with authorities. He came back to deal with them. He communicated with DEOC. This evidence is substantial. Again, we've talked about falsehoods before, but there certainly is, you know, the lie here is the lie. The reports were done. And I'll just read from the indictment here. The indictment states that the defendants transmitted and caused to be transmitted reports of air quality monitoring and employee exposure monitoring results for specialist enable at the Denali Housing Community demolition site in the Virgin Islands to the Virgin Islands Housing Authority, stating that the defendant, Dylan C. Sharns, analyzed the air samples and found them within acceptable limits when the defendant's view that the air samples had in fact not been analyzed. That is a lie. The government against substantial evidence establishing that that's not falsehood. I think, again, Mr. Dugan's testimony, we have addressed that here. This report had a very specific concern with respect to Mr. Dugan's testimony that the government addressed by recalling this barrel, wanted to establish the connection in these reports. And then... Well, speak for a moment, if you wouldn't mind. I'm fishing for a moment. Sure. It's not just that they talked about this building, which is a building that the defendants didn't have access to. It's not just that they talked about the time, which is a year after the defendants did something. But it's that they talked at length about the building condition itself, which had nothing to do with them, and that the discussion of the deplorable conditions itself was a judicial and a political case. How would they choose perception of their clothes and use of discretion to do that, regardless of what this barrel had to say in response to that? Well, I think that the evidence... One, I don't think we can say that the deplorable conditions were not at all attributable to the defendants and weren't relevant to the case. There was earlier testimony about this asbestos being put by these defendants into the bath tubs, into the toilets. You had that from... Yes, there's no evidence that they were ever in a building that they weren't. I thought it was, in fact, conceded that they hadn't worked out that condition. That is correct, Your Honor. Then how is the condition of 31M anything to do with that? Except for on the point you've already made. I'm trying to get you to speak to his point, to talk about how awful Building 31 was. It just had nothing to do with them, with their own prejudices. I think that... Well, I think, Your Honor, that, again, there... I think the question is whether this rises to a level of unimprejudiced, and I think the answer is no. The answer is no because, again, it was communicated to the jury. This was not the district court's concern. The district court addressed that concern, and the defense was able to make the point that the defendants were not in Building 31. It is not as if the jury thought. I think this would be a different case, Your Honor, if it was said that the jury thought that these defendants went into Building 31. That might be a situation of undue prejudice possibly. But here, the jury was not confused about that point. The defense had the opportunity to make that point, and it was made. So there might be a risk of... There might be some... It doesn't rise to the level of undue prejudice because the jury was not confused on that point. Your Honor, perhaps it would be appropriate to turn the ball to the subsequent jury that is raising their case. I can't name them specifically, but I can say that Mr. Starnes was unfairly subjected to a lot of prejudice by the organizers. Your Honor, can you speak to, and specifically the argument that, as I understand it, the district judge didn't do anything to put on the record a finding or reasoning to support that Mr. Starnes was responsible for controlling or supervising both the participant and both Mr. Starnes' client? I'm not sure if you have this out there. Certainly, Your Honor. They rely on the United States v. Petora case, which requires the finding of one other culpable party of participants. In this case, the court found that that other culpable participant was Mr. Tacano. And the evidence is very clear on that. Mr. Tacano certainly knew what was going on. He testified as filed that everything in there was a violation. He would just do what he was told to do. Was the district court responsible for putting on the record something that would show that Mr. Tacano qualifies as a participant? I think that could be the case. Yes, he said he was supervising Mr. Tacano. But the judge didn't say anything about Mr. Tacano being responsible for something that both Mr. Starnes did not. Is that a legal reason? First, it's right about the record in the home. Second, it's what he claims to be responsible for. I don't think the record can be—I don't think there's any indication that the district court didn't understand what he was required to find. I don't think the record shows he understood what he was required to find. And why do you say that? That's important. Why do you say that? What do you rely on the record to say that the district court understood the import of evidence? There were statements from appellants about the importance of it, right? That was already there. Correct. The statement—I mean, the evidence—the district court said the evidence suggests that the purpose of the sentencing, I find, you were an organizer of this activity and that you involved Mr. Tacano as a result of it back-forking other individuals. I think that the district court could have made it more clear, but I think that it was clear at the sentencing and the parties' positions on this at the sentencing that this is what the district court was required to find. I do think it would be ideal if you had made a clearer statement in that point. But it certainly— This is correct, Your Honor. Thank you. Thank you. Thank you. It finds the adjustment at number 51. I'd have to go back through again and see what it said about Mr. Tacano. Well, I'd have to go through that again. I think that, yeah, the district court certainly adopted, with respect to Mr. Starnes, the pre-sentence report with the exception of the one poor-level injury. So it did adopt that. At a minimum, though, your position, I take it, is that given that this very argument was made by the district court, the district court had to have understood that you were a participant in the involvement of Mr. Tacano by name. There was—what's it imply? Is that it? That is our argument, Your Honor. I think that, like I said, it wouldn't have been pressable for the district court to make it more clear in its statement, but by identifying—the government made the argument at the sentencing that the other—the participant that Mr. Starnes organized was Mr. Tacano, and we laid that out in our sentencing memorandum and presented that to the court, and the district court made that specific finding that we urged it to make, that Mr. Tacano was the other culpable participant. So that is how that went. And, of course, all of these, you know, can often—can often prefer for it to have been stated more expressly, but we made the specific argument that Mr. Tacano was the other culpable participant. And under the CORA, all that is required is one additional culpable participant for the sentencing to apply. So here we think that that is—that is established. Are there—unless the court has any other questions for you. Returning back to the Dugan testimony, I just want to briefly make the point that the government argues, well, whatever undue prejudice was secured because the defendant had a chance to testify. And I really don't think that can be the test, because I think that that just basically is the rule requiring the judge to take a balancing test as well as an undue prejudice. It, you know, always, you know, certainly would have been as effective, for example, not to have at least an attempt to cross-examine the witness, but only if the witness had testified. I don't think that, just because there was a right to cross-examination, somehow the defendant was no longer prejudiced. After the remaining arguments, I would like to brief the court. Thank you. Thank you. And we thank you and both counsels for helpful arguments of complicated case. Thank you.